IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Susan Bogart, *an Illinois sole proprietorship doing business as* Law Offices of Susan Bogart,<br><br>Plaintiff,<br><br>v.<br><br>Paul Thanasides, McIntyre Thanasides Bringgold Elliot Grimaldi Guito & Matthews, P.A., *a Florida Professional Association*, Maximillian Amster, Devan Padmanabhan, and Padmanabhan & Dawson, PLLC, *a Minnesota Professional Liability Company*,<br><br>Defendants. | ) | No. 24 C 4770 |

Memorandum Opinion and Order

Three motions are currently pending in this action, all of which seek to dismiss the third iteration of attorney Susan Bogart's complaint against individuals and entities she claims interfered with her contractual relationship with a former client,

NEXT Payment Solutions, Inc.[1] Bogart alleges that pursuant to engagement and partial contingency agreements she entered into with NEXT in 2017 and 2018, she spent thousands of hours pursuing NEXT's claims against an entity called CLEAResult Communications ("CCI") for misappropriation of trade secrets, breach of contract, and various equitable doctrines.[2] *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc*. No. 1:17-cv-08829 (N.D. Ill.) ("*Next v. CCI*"). But on June 6, 2019, with *Next v. CCI* pending, NEXT replaced Bogart as lead counsel, slashed the contingency fee it promised her in the 2018 agreement, and offered her $500,000 to "remain on the case to answer questions only." Second Am. Compl. ("SAC"), ECF 91 at ¶ 94. When Bogart refused these terms, NEXT terminated its agreements with her on June 10, 2019. *Id*. at ¶ 100.

Bogart later sought and obtained a judgment against NEXT for nearly two-and-a-half million dollars in *quantum meruit*, plus a portion of any recovery NEXT might obtain in *NEXT v. CCI*. But NEXT ultimately lost that suit, *see generally NEXT Payment Sols., Inc.*

---

[1] Except where otherwise noted, the facts recited here are drawn from the Second Amended Complaint filed on November 24, 2025. For ease of exposition, I refer to Susan Bogart and her sole proprietorship, the Law Offices of Susan Bogart, collectively as either "Bogart" or "plaintiff," since sole proprietorships have no independent legal identity. *See Jeroski v. Fed. Mine Safety & Health Rev. Comm'n*, 697 F.3d 651, 652 (7th Cir. 2012).

[2] Bogart alleges that attorney Eric C. Cohen acted as her co-counsel pursuant to these agreements. But as nothing in the parties' submissions suggests that Cohen's participation in *NEXT v. CCI* is material to any issue in this case, I do not mention him further.

*v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1093 (7th Cir. 2026), and with it, the ability to satisfy Bogart's judgment.[3] In this action, Bogart seeks damages from the parties she blames for her termination as NEXT's counsel and NEXT's failure to pay her what it owes. Bogart sues:

1. Maximillian Amster, an individual who allegedly owned, managed, and/or controlled several litigation funding entities that provided the funding NEXT needed to pursue *NEXT v. CCI*, including its attorneys' fees[4];
2. Paul Thanasides, an attorney who represented Amster and the litigation funding entities in connection with their investment in *NEXT v. CCI*, and who, along with defendant Devan Padmanabhan, appeared in that action on behalf of NEXT following Bogart's termination. Thanasides also represented NEXT in the arbitration and litigation of its fee dispute with Bogart;

[3] The SAC is silent as to the steps, if any, Bogart has taken to collect her judgment against NEXT. But I infer from Bogart's allegations that NEXT could not have pursued its claims against CCI without a $500,000 investment by defendant Amster, *see* SAC at ¶ 54, and that defendants' failure to take *NEXT v. CCI* to trial caused Bogart to lose attorneys' fees and costs in the amount of her judgment, *see id.* at ¶ 117, that having failed to obtain relief in that suit, NEXT is effectively judgment-proof.

[4] Earlier versions of the complaint named these entities as defendants. The SAC describes these entities' management structure and attributes substantive conduct to them, but it asserts liability only against Amster. Because nothing in my analysis turns on the relationships between and among Amster and these entities, I may refer to them collectively as the "litigation funding entities" (or any one of them indifferently as a "litigation funding entity").

3. The "McIntyre Law Firm,"[5] several of whose attorneys, including Paul Thanasides, represented Amster and his funding entities in *NEXT v. CCI* and represented NEXT in its fee dispute with Bogart;
4. Devan Padmanabhan, an attorney and Member of defendant Padda Law Group, PLLC,[6] who appeared on behalf of NEXT in *NEXT v. CCI* following Bogart's termination; and
5. Padda Law Group, PLLC, several of whose attorneys, including Devan Padmanabhan, appeared on behalf of NEXT in *NEXT v. CCI* following Bogart's termination.

SAC, ECF 91, at ¶¶ 11-17; 29-32.

Bogart asserts three claims against each defendant: tortious interference with business relations; tortious interference with contract; and civil conspiracy. Her theory of liability is that defendants "poach[ed]" *NEXT v. CCI* "to obtain more of the proceeds NEXT was likely to recover" in the suit "and to line their own pockets." *Id.* at ¶¶ 5-6, 122. Bogart alleges that Amster and Thanasides recruited Padmanabhan to take over the litigation, and that Amster, Thanasides, and Padmanabhan "pressured" and "forc[ed]" NEXT to replace Bogart with Padmanabhan and Padda Law Group. *Id.* at ¶¶ 5, 94. Defendants allegedly achieved this

[5] This is how the parties refer to the defendant the case caption names, "McIntyre Thanasides Bringgold Elliot Grimaldo Guito & Matthews, P.A."

[6] The case caption identifies this defendant as "Padmanabhan & Dawson, PLLC," but there appears to be no dispute that these entities are one and the same, and the correct name is "Padda Law Group, PLLC."

objective by falsely stating that Bogart was not equipped to handle the litigation; by maligning Bogart's representation of NEXT by mischaracterizing key decisions in the case; by misleading NEXT into believing that Padmanabhan and the Padda Law Group were qualified to pursue NEXT's claims against CCI when they were not; and by incorrectly advising NEXT that discharging Bogart would extinguish its obligation to pay her the contingency fees provided in the 2017 and 2018 agreements. *Id.* All of this misconduct began "at least as early as March 2019" and culminated in Bogart's June 2019 ouster. *Id.*

Because I agree with Thanasides, Padmanabhan, and their respective law firms (collectively, "the lawyers and law firms") that the Second Amended complaint establishes, on its face, that Bogart's claims against them are barred by the two-year statute of limitations in 735 ILCS 5/13-214.3(b), I grant their motions on that basis. Bogart's claims against Amster are arguably untimely too; but because they are subject to a five-year limitations period, the question is too close to resolve on the pleadings. Nevertheless, the only plausible interpretation of Bogart's allegations as to Amster establish that his conduct is conditionally privileged, so her claims against him are likewise subject to dismissal.

I.

According to the Second Amended Complaint, NEXT "could not have afforded to pay the litigation costs" of *NEXT v. CCI* without litigation financing from Amster's litigation funding entities.[7] SAC, ECF 91 at ¶ 54. These entities began funding *NEXT v. CCI* in September of 2018, and they made three payments into Bogart's client account in September, October, and December of 2018. *Id.* at ¶ 57. During this time period, litigation activity included CCI's filing of a motion for summary judgment, followed by NEXT's filing of a second amended complaint, which CCI successfully moved to strike. *Id.* at ¶¶ 58-60. On February 27, 2019, the court partially granted CCI's summary judgment motion, allowing only a portion of NEXT's trade secret claims to proceed. *Id.* at ¶¶ 57-60.

Against this backdrop, Amster brought in Thanasides—an attorney Amster had known "for a long time," who had "advised Amster in connection with Amster's decision to start a litigation financing fund," and who had been "monitoring" *NEXT v. CCI* for the litigation funding entities. SAC, ECF 91 at ¶¶ 73-75. Amster told Bogart in January of 2019 that Thanasides would help to "review

[7] The Second Amended Complaint spends roughly a third of its factual allegations narrating the proceedings in *NEXT v. CCI* over the course of Bogart's tenure as lead counsel. *See* SAC, ECF 91 at ¶¶ 41-72. While most of this account is immaterial to the issues I must resolve here, I summarize a few of the key inflection points as context for Bogart's allegations.

and finalize the budget and generally monitor the case going forward." *Id.* at ¶ 75.

Motion practice intensified throughout March, April, and May of 2019, as CCI challenged the adequacy of NEXT's trade secret definitions. *See id.* at ¶¶ 61-69. In late March, CCI successfully moved to compel NEXT to identify with greater particularity the trade secrets it claimed CCI had misappropriated. The court ordered NEXT to serve supplemental interrogatory responses, which NEXT served and filed on April 19, 2019. Dissatisfied with NEXT's supplemental responses, CCI moved on May 2 to exclude all evidence of NEXT's putative trade secrets at trial as a discovery sanction for failing to comply with the court's order.

In an order dated May 8, 2019, the court declined to impose sanctions, concluding that NEXT had complied with its order to supplement and that CCI's challenge to NEXT's trade secret definitions was a merits issue "properly raised in a dispositive motion or at trial." SAC, ECF 91 at ¶ 66. Accordingly, the court granted CCI's alternative requests to reopen discovery to allow it to respond to NEXT's supplemental definitions and to file a second summary judgment motion targeting the adequacy of those definitions. *Id.* at ¶¶ 66-67. The court also addressed the parties' dispute over the trial date, which was then scheduled for August 8, 2019. Bogart, on behalf of NEXT, insisted that NEXT was prepared to begin trial on the scheduled date. But the court sided with

CCI, noting that it "share[d] Defendant's concern that the parties are not prepared to try this complex case in light of Plaintiff's recently-filed document identifying 34 different software features as claimed trade secrets," and observing that the proceedings had been delayed for a number of reasons, "which include Plaintiff's decisions to seek extensions, amend its complaint, disclose its asserted trade secrets late in the case and pursue broad theories of recovery that lack merit." *See* CCI, Order of May 8, 2019, at 1, 2.[8]

Around the same time, Thanasides began participating in status calls about the litigation with Amster, Bogart, and NEXT's CEO, Matt Peterson. SAC, ECF 91 at ¶ 77. Throughout March and April, Amster and Thanasides encouraged NEXT to add Thanasides to NEXT's litigation team – a development Bogart resisted. *Id.* at ¶¶ 77-79. Nevertheless, Amster continued to involve Thanasides in the litigation, and, on May 3, 2019, Amster sent an email to Peterson, Bogart, and Thanasides stating, "[w]e will commit to fund $350K for certain items on NEXT's trial budget," subject to certain "conditions to funding," including "finalization of

---

[8] Bogart quotes extensively from Judge Castillo's May 8, 2019, Order, which is a public record, and she relies on it to support her claims. Accordingly, I may take judicial notice of the Order's contents. *See*, e.g., *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

client-attorney agreements" and "attorney-client compensation arrangements," which Amster understood "may be in flux." *Id.* at ¶ 80. NEXT had not told Bogart, however, that its relationship with her was in flux. *Id.*

On May 21, 2019, NEXT engaged Padmanabhan and Padda Law Group, and over the following days, Padmanabhan met with Peterson and NEXT's president, Jill Stasziak. Bogart alleges that at these meetings, Padmanabhan misrepresented his qualifications and ability to handle *NEXT v. CCI* and misled NEXT into believing that Bogart lacked the ability or the resources to do so. *Id.* at ¶¶ 84-85. Also, Padmanabhan falsely told NEXT's officers that the court had sanctioned NEXT in its May 8, 2019, order, when in fact the court had denied CCI's request for sanctions. *Id.* at ¶ 88.

Bogart disputed Padmanabhan's representations in phone calls with Peterson on May 27, 28, and 29, and she set the record straight regarding the sanctions portion of the court's May 8, 2019, order. Nevertheless, on June 6, 2019, Peterson and Padmanabhan told Bogart that Padmanabhan was replacing her as lead counsel in *NEXT v. CCI*, and that her partial contingent fee percentage would be reduced to 5% of any recovery. *Id.* at ¶ 94. After Bogart rejected NEXT's offer to pay her $500,000 to remain on the case "to answer questions only," Amster, Thanasides, and Padmanabhan allegedly "forc[ed] NEXT to terminate its May 2018 attorney client agreement" with her. *Id.* On June 7, 2019, NEXT engaged Thanasides and the McIntyre

Law Firm to represent it in *NEXT v. CCI*, alongside Padmanabhan and Padda Law Group. *See id.* at ¶ 97.

II.

The lawyers and law firms argue that Bogart's claims are untimely under Section 13-214.3 of the Illinois Code of Civil Procedure, captioned "Attorneys," which provides:

> An action for damages based on tort, contract, or otherwise (i) against an attorney[9] arising out of an act or omission in the performance of professional services ... *must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought*.

735 Ill. Comp. Stat. Ann. 5/13-214.3 (emphasis added).[10] The Supreme Court of Illinois interpreted the scope of this section broadly in *Evanston Ins. Co. v. Riseborough*, 5 N.E.3d 158 (Ill. 2014), observing:

> The "arising out of" language indicates an intent by the legislature that the statute apply to all claims against

[9] The statute defines "attorney" to include "a professional partnership of attorneys, together with its employees, partners, and members who are attorneys," as well as "a professional service corporation of attorneys, together with its employees, officers, and shareholders who are attorneys," thus encompassing all of the lawyer and law firm defendants.

[10] Padmanabhan and Padda Law Group also raise the threshold argument that the SAC, like its predecessors, does not adequately plead subject-matter jurisdiction. Although they are formally correct – bafflingly, despite not one but *two* admonishments that the correct way to plead diversity jurisdiction when an LLC or a PLLC is involved is to identify the citizenship of each the entity's *members*, the SAC's jurisdictional allegations concerning Padda Law Group identifies only the citizenship of that entity's "manager," "owner," and "partners" – I am satisfied based on Padda Law Group's own representation that all of its members are individuals who are citizens of Minnesota that my jurisdiction is secure.

> attorneys concerning their provision of professional services. There is no express limitation that the professional services must have been rendered to the plaintiff. Nor does the statute state or imply that it is restricted to claims for legal malpractice.

*Id.* at 166. *See also Rucker v. Heston*, No. 25 CV 7615, 2026 WL 986206, at *3 (N.D. Ill. Apr. 13, 2026) (Shah, J.) ("the statute does not only apply to legal services; it applies to professional services" performed by an attorney).

The Second Amended complaint leaves no room to doubt that Bogart's claims against the lawyers and law firms arise out of their provision of professional services. Indeed, it makes the point explicitly, alleging, for example, that "Thanasides, *acting as an attorney with the McIntyre Law Firm*, advised and represented Amster and Veridis as to the litigation funding to NEXT in connection with [*NEXT v. CCI*]," and "monitored" the litigation, including by reviewing court filings and expert reports. SAC, ECF 91 at ¶¶ 29, 75 (emphasis added). In other words, Thanasides performed classic legal services. Padmanabhan, for his part, was recruited to provide "a 'second opinion' on the identification of trade secrets," and he ultimately replaced Bogart as NEXT's lead litigation counsel. *Id.* at ¶ 81, 94. The services he provided, too, were undeniably professional services of a lawyer.

Bogart does not meaningfully dispute that her claims against the lawyers and law firms arise out of their provision of professional services. Instead, she argues that: 1) affirmative

defenses such as statutes of limitations should not be resolved on the pleadings; 2) her civil conspiracy claim pleads a continuing violation through February 12, 2024, the date the district court entered final judgment in favor of CCI, so that claim timely; and 3) it would be "incongruous" to apply different statutes of limitations to the attorney and non-attorney defendants since they conspired together and engaged in similar conduct. None of these arguments persuades.

It is true, as a general matter, that affirmative defenses are inappropriate for resolution under Fed. R. Civ. P. 12(b)(6). But courts have dismissed claims against attorneys as untimely under Section 13-214.3 "when the allegations of the complaint reveal that relief is barred" by that statute. *See*, e.g., *Saleh as Tr. of Nabil Saleh M.D. LTD Pension Plan v. Merch.,* No. 14-CV-09186, 2019 WL 1331788, at *7 (N.D. Ill. Mar. 25, 2019), *aff'd sub nom. Muskegan Hotels, LLC v. Patel*, 986 F.3d 692 (7th Cir. 2021)). That is the case here because Bogart's own allegations establish that she "knew or reasonably should have known of the injury for which damages are sought" no later than June 6, 2019, when Peterson and Padmanabhan told her she "was being replaced." SAC, ECF 91 at ¶ 94. That Bogart "made clear to NEXT" the following day "that under Illinois law Bogart...would not only be entitled to quantum meruit fees which could include not only compensation based on Bogart's hourly rate compensation (sic) but also some or all of

the Partial Contingent Fee" cements the inference that Bogart knew of her injury. *Id.* at ¶ 98. Indeed, Bogart's veiled threat to sue NEXT for replacing her shows that she not only knew of her injury, but she also believed it was wrongfully caused. Yet, she did not file this action until June 7, 2024, five years and one day after the June 6, 2019, email.

Nor does any of Bogart's claims suggest a continuing violation. "The continuing violation doctrine is...best characterized as a doctrine governing the accrual of a claim." *Pitts v. City of Kankakee, Ill.*, 267 F.3d 592, 595 (7th Cir. 2001). Bogart insists that her civil conspiracy claim did not accrue until final judgment was entered in *NEXT v. CCI*, which she calls "the last overt act" in the conspiracy. Resp., ECF 117 at 30. Setting aside that the court's entry of judgment is not an "act" by defendants at all, at most the judgment increased the magnitude of Bogart's loss; it did not create a fresh injury. *See Bernard v. Scott*, 501 F. Supp. 3d 611, 621 (N.D. Ill. 2020) (a continuing violation "exists when the defendant commits discrete but repeated violations."). Nor does the fact that Bogart "continued to suffer negative consequences" of her termination defer accrual of her claims. *Robinson v. Stanley*, 474 F. App'x 456, 458 (7th Cir. 2012).

Finally, Bogart argues that the lawyers and law firms should not be subject to Section 13-214.3 because their conduct "overlapped" with that of non-attorneys. But the only case she

cites in this connection, *McKinney v. Panico*, No. 21-4602, 2022 WL 4551695 (N.D. Ill. 2022), does not support her argument on the allegations here. In *McKinney*, the plaintiff's claims "predominantly" arose out of the defendant's role as "a partner in and promotor of" investments in which the plaintiff claimed he was fraudulently induced to invest, and the complaint "contain[ed] few allegations concerning [the defendant's] provision of legal services." *Id.* at *8. As noted above, the SAC explicitly challenges conduct that the lawyers and law firms undertook *qua* attorneys, so *McKinney* is inapposite. That Amster – whom the SAC also identifies as an attorney, *id.* at ¶ 11, but does not seek to hold liable for the performance of "professional services" – does not assert Section 13-214.3 underscores the distinction.

Nevertheless, Amster too is shielded from liability because the SAC alleges everything needed to establish that his conduct was conditionally privileged. "Courts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights.[11] *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989). One such interest is the

[11] Although the SAC identifies two distinct theories of liability—tortious interference with business relations and tortious interference with contract—the privilege defense applies to both, so I need not examine the nuances of the distinctions between them.

defendant's financial interest in another's contracts or business relations. *See Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990). The *Allen* court applied Section 769 of the Restatement (Second) of Torts, which provides:

> One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he
>
> (a) does not employ wrongful means and
>
> (b) acts to protect his interest from being prejudiced by the relation.

Restatement (Second) of Torts § 769 (1979).[12] As NEXT's litigation funder whose investment in *NEXT v. CCI* was critical, Amster undeniably had a financial interest in the litigation. Accordingly, Bogart bears the burden of pleading and proving that any interference by him was "unjustified or malicious." *HPI Health Care Servs., Inc.* 545 N.E.2d at 677. Nothing in the complaint suggests these elements.

---

[12] Although this section, by its terms, applies only to interference with "prospective contractual relations," the Seventh Circuit applied it to a claim of interference with an existing contract in *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990), and lower courts have held this application to be "binding," at least as to Wisconsin law. *Assembly Component Sys., Inc. v. Platinum Equity*, L.L.C., No. 09-CV-778, 2010 WL 2719978, at *7 (E.D. Wis. July 7, 2010).

To the contrary, the only reasonable interpretation of the conduct Bogart attributes to Amster is that he honestly believed that NEXT's litigation interests – and thus his own, wholly aligned financial interests – were better served with Padmanabhan, rather than Bogart, at the helm. Given his financial stake in the litigation, he was privileged to insist that NEXT engage the attorneys and firms he thought best-suited to the case, even at the expense Bogart's countervailing interest.[13]

It bears noting that few of the SAC's references to Amster suggest any sort of unlawful activity. True, the SAC contains a handful of conclusory allegations, such as that "Thanasides and Amster took steps to interfere with Bogart's engagement agreement with NEXT without basis, legal privilege or justification...." SAC, ECF 91 at ¶ 78. But allegations of unspecified "steps" coupled with legal conclusions do not plausibly suggest interference accomplished by wrongful means. Elsewhere, Bogart tries to portray Amster's conduct as insidious, alleging, for example, that he "misrepresented and falsely characterized Bogart's representation"

[13] I agree with Amster that an illustration in Section 769 of the Restatement is instructive: "A provides the financial backing for B's theatrical production. The arrangement is in the form of a loan for the purposes of the production. While B undertakes to repay the loan in any event, in fact the chances of repayment depend upon the success of the play. B is about to engage C to play the leading role. Under the conditions stated in Clauses (a) and (b), A's interference with the prospective relation by causing B not to have C play that role is not improper."

and "misled NEXT into believing" that Padmanabhan was better able than she to handle *NEXT v. CCI*. *Id.* at ¶ 5. Setting aside that the SAC suggests no plausible reason Amster would mislead NEXT into replacing Bogart with counsel he believed was *less* qualified, given his own interest in NEXT's litigation success, these statements plainly reflect Amster's opinions, not facts. As such, they "cannot form the basis of an action for tortious interference." F*idlar Techs. v. LPS Real Est. Data Sols., Inc.*, No. 4:13-CV-4021-SLD-JAG, 2013 WL 5973938, at *14 (C.D. Ill. Nov. 8, 2013).

This leaves only Bogart's civil conspiracy claim, which is dismissed as duplicative of her tortious interference claims. *See Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("there is no basis in common law thinking for a tort of conspiracy to commit a tort. If there is a conspiracy and it fails, there is no injury and hence no tort liability; if it succeeds, the damages are fully recoverable in an action on the underlying tort."). Bogart's citation to *Dowd & Dowd, Ltd. v. Gleason,* 693 N.E.2d 358, 371 (1998), does not compel a contrary conclusion because in that case, the plaintiff's conspiracy count involved a defendant not named elsewhere in the complaint. *Id.* Indeed, courts applying Illinois law routinely dismiss civil conspiracy claims as duplicative when they involve no new defendants or facts beyond those alleged in support of the underlying tort claims. *See*, e.g., *Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 950 (N.D. Ill. 2014)

(citing cases); *Thomas v. Fuerst*, 803 N.E.2d 619, 626 (Ill. App. Ct. 2004) (if a "plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails.").

III.

For the foregoing reasons, defendants' motions to dismiss the Second Amended Complaint are granted. In light of plaintiff's failure to plead viable claims against the individuals and entities named in this and previous versions of her complaint, and because the reasons for dismissal discussed above do not appear susceptible to cure, dismissal is with prejudice.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: September 11, 2026